**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

United States of America,                    Case No. 15-cr-153 (DSD/TNL)

              Plaintiff,

v.                                           **REPORT AND
                                             RECOMMENDATION**

Omid Ngange Akale (2),
Joseph Francis Werb (4),
Temetrius Latonya Nickerson (6),

              Defendants.

Manda M. Sertich, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government);

Paul J. Edlund, Paul Edlund Law, 220 South Sixth Street, Suite 1225, Minneapolis, MN 55402 (for Defendant Akale);

Andrew S. Birrell and Paul C. Dworak, Gaskins Bennet Birrell Schupp, LLP, 333 South Seventh Street, Suite 3000, Minneapolis, MN 55402 (for Defendant Werb); and

Karlowba R. Adams Powell, Powell Law Office, 835 Geranium Avenue East, St. Paul, MN 55106 (for Defendant Nickerson).

     This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Werb's Motion to Suppress Statements, (ECF No. 123), Defendant Werb's Motion for Severance, (ECF No. 129), Defendant Nickerson's Motion to Suppress Statements Obtained in Violation of Defendant's Constitutional Rights, (ECF No. 146),[1] and Defendant Akale's Motion to Suppress Statement, (ECF No. 173). These motions

---

[1] As required by the Court, (*see* ECF Nos. 182, 188), Defendant Nickerson clarified her previously-deficient motion through a later filing. (ECF No. 189).

have been referred to the undersigned for a report and recommendation to the district court, the Honorable David S. Doty, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1. Given the combined nature of the suppression hearing and the interrelatedness of some of the witnesses and facts at issue, the Court addresses all the above-mentioned motions in this consolidated report and recommendation.

Defendants Werb and Akale are charged with conspiracy, in violation of 18 U.S.C. § 371, in which they are each alleged to have sold stolen and fraudulently-obtained unauthorized access devices to their co-defendant, Zibo Li, who then sold the access devices to buyers in Hong Kong for substantial profits. (ECF No. 1). Defendant Nickerson is charged with conspiracy, in violation of 18 U.S.C. § 371, in which she is alleged to have provided co-conspirators with stolen means of identification which were used to fraudulently obtain access devices. (ECF No. 1). Defendant Nickerson is also charged with aggravated identity theft, in violation of 18 U.S.C. § 1028A. (ECF No. 1).

Defendant Werb filed his Motion to Suppress Statements, (ECF No. 123), and Defendant Akale filed his Motion to Suppress Statement, (ECF No. 173), each seeking to suppress statements made to law enforcement on February 27, 2014 during the execution of a search warrant at their shared residence. Defendant Nickerson filed her Motion to Suppress Statements Obtained in Violation of Defendant's Constitutional Rights, (ECF Nos. 173, 189), seeking to suppress statements made to law enforcement on March 21, 2015 during the execution of a search warrant at her residence. The Government opposes the motions. (ECF Nos. 170, 176). A hearing was started on September 30, 2015,

2

continued on October 7–9, 2015, and completed on October 13, 2015. (ECF Nos. 182, 194, 195, 197, 198).[2] Assistant United States Attorney Manda M. Sertich appeared on behalf of the United States of America (the "Government"). Paul J. Edlund appeared on behalf of Defendant Omid Ngange Akale. Andrew S. Birrell and Paul C. Dworak appeared on behalf of Defendant Joseph Francis Werb. Karlowba R. Adams Powell appeared on behalf of Defendant Temetrius Latonya Nickerson.

The Court heard testimony from U.S. Secret Service Senior Special Agent Michael Olson ("SA Olson"), St. Paul Police Sergeant Nikkole Peterson ("Sgt. Peterson"), Defendant Werb, Quinh Nguyen, St. Paul Police Sergeant Charles Anderson ("Sgt. Anderson"), and Defendant Nickerson. The parties offered and the Court received: Government Exhibits 1 and 2: photographs of Defendant Werb; Government Exhibit 3: photograph of Defendant Werb with metadata displayed; Government Exhibit 4: consent to search form signed by Quinh Nguyen; Government Exhibit 5: Saint Paul Police Department *Miranda* rights form signed by Defendant Nickerson; Government Exhibit 6: audio recording of the interview of Defendant Nickerson; Defendant's Exhibit 1: Hennepin County District Court search warrant; and Defendant's Exhibit 2: State of Minnesota criminal complaint against Defendant Werb.

Defendant Werb also filed a motion to sever his case for trial from that of his co-defendants. (ECF No. 129). Defendant Werb asks the Court to review *in camera* any statement made by his co-defendants that the Government intends to use as evidence in

---

[2] The motions hearing was originally scheduled for September 30, 2015, but due to an oral motion that required briefing, (*see* ECF No. 188), the remainder of the hearing was completed as permitted by the Court's schedule.

deciding his severance motion. (ECF No. 129). The Government opposes the motion. (ECF No. 170). The parties agreed to submit the motion on the papers. (Tr. 7:1–4, 8:16–23).[3]

Post-hearing briefing is complete and these motions are ripe for a determination by the Court. Based upon all the files, records, and proceedings herein, along with the testimony and exhibits presented, the undersigned recommends that Defendants' motions be denied.

## I.   FINDINGS OF FACT

### A.  The Credibility of the Witnesses

SA Olson has about 18 years of law enforcement experience, most of it with the U.S. Secret Service. (Tr. 15:18–19, 35:17–38:16). He is currently assigned to the Minnesota Bureau of Criminal Apprehension's ("BCA") Financial Crimes Task Force. (Tr. 15:20–24). SA Olson's testimony comported with the evidence and other testimony received. The Court finds SA Olson a credible witness.

Sgt. Peterson has been with the St. Paul Police Department for about 13 years. (Tr. 113:2–16). She is currently assigned to the Special Investigations Unit, where she is tasked with locating fugitives, intelligence operations, organized crime, and long-term fraud investigations. (Tr. 113:17–25). Sgt. Peterson's testimony comported with the evidence and other testimony received. The Court finds Sgt. Peterson a credible witness.

---

[3] References are to the consolidated transcript pages of the motions hearing found at ECF Nos. 221, 215–217, 207.

Defendant Werb also testified. While his testimony was not wholly incredible, Defendant Werb hedged his statements as his "best guess," what something "seemed" like, or provided the general caveat that he was "hazy." For example, Defendant Werb testified that he was awakened by law enforcement's entry into his home at around 9:00 a.m. (Tr. 175:1–3). Defendant testified that his bedroom did not have a clock, so he based all his time observations on his "internal clock." (Tr. 182:16–183:10). He said the interview with law enforcement *seemed like* a couple hours. (Tr. 177:3–4). That it *seemed like* an hour that he was naked under the covers of his bed. (Tr. 179:16–180:22). While Defendant Werb's testimony, generally, does not contradict that of SA Olson and Sgt. Peterson, the portions of his testimony that do are too nebulous and of dubious credibility for this Court to rely upon.

Ms. Nguyen is in a four-year relationship with Defendant Werb. (Tr. 218:22–219:12). She has been living with Defendant Werb since mid-2015. (Tr. 203:18–21, 218:25–219:12). She works with Defendant Werb, doing home remodeling. (Tr. 203:22–204:6). Ms. Nguyen told law enforcement her only source of income during the time of the search warrant was money she received from Defendant Werb. (Tr. 221:7–222:5). Like Defendant Werb, Ms. Nguyen noted that "everything seemed very long that day." (Tr. 226:16–19). Ms. Nguyen arrived at the residence at about 11:50 a.m. and the search was conducted at her own home about 1:00 p.m. (Tr. 34:2–12, 137:22–24, 224:23–227:16; Gov't Ex. 4). This timing is impossible if Ms. Nguyen was subjected to the two plus hours of questioning she claimed in her testimony. But timing was not the only inconsistency in Ms. Nguyen's testimony. Ms. Nguyen testified that she and Defendant

Werb were in Zibo Li's wedding party, but that they are not good friends. (Tr. 219:21–221:6). Shortly before February 27, 2014. Ms. Nguyen called Zibo Li's wife because she had a newborn child and was having a tough time and nobody had heard from Zibo Li or his wife recently. (Tr. 219:21–221:6). Ms. Nguyen claimed this phone call had nothing to do with the search warrant executed at Zibo Li's home at around the same time. (Tr. 219:13–221:6). Given her relationship with Defendant Werb and the Court's observations that her testimony was evasive and lacking in direct knowledge of the events at issue, the Court finds Ms. Nguyen not to be a credible witness.

Sgt. Anderson has been in law enforcement for about nine years. (Tr. 230:6–9). Sgt. Anderson is currently a patrol supervisor, but at the time frame related to his testimony, he served as the head of the Organized Retail Crimes Unit and as a task force officer with the BCA's Financial Crimes Task Force. (Tr. 230:10–15). Sgt. Anderson's testimony comported with the evidence and other testimony received. The Court finds Sgt. Anderson a credible witness.

Defendant Nickerson's account of events was not credible or reliable. During her interview with Sgt. Anderson, Defendant Nickerson stated "I smoke weed constantly" and explained it affected her memory. (Gov't Ex. 6). Later during the interview, Defendant Nickerson indicated she used marijuana regularly and spent approximately $250 every two weeks buying marijuana. (Gov't Ex. 6). Defendant Nickerson's testimony contradicts the audio recording, and to correct for this, she alleges that she was interviewed for some period of time before the audio recording began. This does not comport with the timeline established through credible testimony and other submitted

evidence. The search warrant at her home was executed at 10:40 a.m. Defendant Nickerson's interview began at about 10:56 a.m. (Tr. 234:3–20; Gov't Ex. 5–6). There was simply no time for law enforcement to conduct the off-the-record interview Defendant Nickerson alleges. Given Defendant Nickerson's regular marijuana use, her admission that her marijuana use affects her memory, the fact that her testimony contradicts the submitted evidence and credible testimony, and the observations by the Court during her testimony, the Court finds her not credible.

### B.  The Entry and Search of Defendants Akale and Werb's Residence

On February 27, 2014, law enforcement executed a search warrant at the residence of Defendants Akale and Werb in Minneapolis, Minnesota. (Tr. 17:7–13, 114:7–10). The law enforcement team executing the search warrant was comprised of 17 officers from state and federal agencies, including the U.S. Secret Service, St. Paul Police Department, and the Minnesota Bureau of Criminal Apprehension ("BCA"). (Tr. 17:14–16). Prior to executing the warrant, all 17 members of law enforcement involved met at the St. Paul Police Department for a briefing at about 8:00 a.m. (Tr. 39:2–8, 83:13–20, 156:12–24). The briefing covered the execution of the search warrant and divided the responsibilities assigned to the officers. (Tr. 83:13–84:7, 89:9–18). The search warrant was shown to the officers. (Tr. 85:7–9). It authorized a daytime search and listed what may be searched and seized. (Tr. 85:7–18; Def.'s Ex. 1). The search warrant authorized the search of the residence, four vehicles, and Defendants Werb and Akale. (Tr. 86:25–89:8, 102:19–24; Def.'s Ex. 1). It authorized the seizure of all cell phones in the residence. (Tr. 101:5–10; Def.'s Ex. 1). SA Olson testified that the briefing emphasized that law enforcement was

executing a search warrant, not an arrest warrant, so if any persons were found in the residence they were to be permitted to leave. (Tr. 45:5–25).The briefing also covered possible interviews of people found in the residence, including assigning such interviews to the officers closest to the investigation. (Tr. 83:24–84:22). SA Olson was assigned to interview Defendant Akale. (Tr. 83:24–84:22). Sgt. Peterson and BCA Agent Doug Henning ("Agent Henning") were assigned to interview Defendant Werb. (Tr. 114:11–16, 115:3–10, 157:10–21). SA Olson testified that no discussion took place regarding how officers would use their weapons, but that in entries that are not high-risk, like the entry involved at Defendants Werb and Akale's residence, it is in the discretion of each officer whether to draw their weapon. (Tr. 39:9–40:8). Law enforcement's first objective was to enter and secure the residence to maintain officer safety and freeze the scene. (Tr. 91:15–92:22, 114:23–115:2, 158:6–21). The briefing also covered the fact that a co-conspirator's home was searched pursuant to a warrant three weeks prior. (Tr. 45:19–25).

The search warrant was executed at approximately 10:00 a.m. (Tr. 17:17–18:11, 114:20–22). Two of the 17 officers were stationed behind the residence in the parking lot to prevent evidence from being tossed out the back windows. (Tr. 40:9–15, 90:8–15, 101:11–18). One officer from the BCA remained outside as an evidence custodian and did not enter until the search was completed. (Tr. 90:16–22). Law enforcement knocked on the front door and announced their presence. (Tr. 90:23–91:1). SA Olson testified that no one yelled or used profanity, but the announcement was loud so as to ensure their identification as law enforcement. (Tr. 92:23–93:6). All law enforcement were wearing

identification that clearly labeled them as law enforcement, such as vests with the term "police." (Tr. 91:9–11, 93:25–94:7, 159:10–160:2, 175:20–176:2).

The door to the residence was opened by Defendant Akale. (Tr. 18:12–18).  Law enforcement explained that they had a search warrant. Defendant Akale was asked to step off to the side so law enforcement could enter. (Tr. 40:9–42:14). SA Olson then drew his weapon from its holster and entered behind three or four other officers, who had also drawn their weapons. (Tr. 17:14–18:24, 40:16–42:14). Law enforcement entered the residence with their weapons at the "low ready."[4] SA Olson testified that St. Paul Police Sergeant Jeremy Ellison stayed with Defendant Akale at the entrance, explaining the search warrant and preventing him from re-entering the residence so as not to interfere with the execution of the warrant. (Tr. 43:15–46:4–47:2). Law enforcement entered and secured the residence room by room. (Tr. 158:6–21). The residence is in a multi-unit building. (Tr. 17:11–13, 42:15–43:14). As you enter, the living room is to the right, two bedrooms and a bathroom were forward from the entrance, the kitchen to the left, and another bedroom was converted into an office. (Tr. 18:25–19:10, 170:11–18).

Defendant Werb was woken by law enforcement's entry into the home, with someone shouting "Where's Joe?" (Tr. 93:16–24, 100:2–9, 174:17–21, 175:13–16). To which he replied, "I am in here." (Tr. 175:13–16). Agent Henning and SA Olson located Defendant Werb in his bedroom. (Tr. 19:11–20:4, 20:20–21:6, 175:13–176:7). Agent Henning told Defendant Werb, who was in bed under the covers, to keep his hands up.

---

[4] Throughout their testimony, law enforcement referred to the "low ready," which this Court understands as having a weapon drawn and held with both hands, but pointed towards the ground. (*see* Tr. 20:20–23, 94:14–20, 240:18–23) .

(Tr. 19:11–20:4, 93:7–94:4). While Agent Henning watched Defendant Werb, SA Olson swept the room and checked under the bed. (Tr. 20:5–13, 20:20–21:9). SA Olson then holstered his weapon. (Tr. 20:5–13). SA Olson testified that Defendant Werb's bedroom was not dark, because there was some daylight entering through the windows. (Tr. 94:24–95:5). Defendant Werb testified that his window is covered by room-darkening blinds, and it was likely that his overhead light provided the illumination. (Tr. 183:11–184:1).

SA Olson testified that Defendant Werb had the blankets over him and was wearing no shirt. (Tr. 20:14–19, 100:16–24, 174:24–25). Defendant Werb asked if he could put some clothes on because he was naked under the covers. (Tr. 176:11–19). Defendant Werb testified that the officers told him to wait, to stay where he was, and not to move. (Tr. 176:11–19). SA Olson checked under the blankets for weapons, seeing none. (Tr. 21:10–15). SA Olson then explained to Defendant Werb that he could get dressed, that law enforcement had a search warrant, and that law enforcement wanted to secure the residence. (Tr. 21:16–22:2). SA Olson found a pair of dark-colored pants near the bed, which he checked for weapons, then handed over to Defendant Werb. (Tr. 21:16–22:2, 22:6–14, 100:16–24, 179:16–180:22). SA Olson did the same with a shirt. (Tr. 22:6–14, 179:16–180:22). SA Olson was in the room for possibly two or three minutes, and not more than five minutes, before being relieved by Sgt. Peterson. (Tr. 22:15–25, 97:25–98:4, 115:17–25, 124:10–13, 157:22–158:5). Defendant Werb testified that this duration "seemed like an hour." (Tr. 179:16–180:22, 185:19–186:1). SA Olson testified that Defendant Werb was dressed when he left, that no yelling or profanity was used while he was in the room, and that no female officer was in the bedroom while

Defendant Werb was in any state of undress. (Tr. 22:3–5, 23:1–7, 98:6–13). While SA Olson was in the room, no *Miranda* warning was given to Defendant Werb. (Tr. 98:14–22, 177:5–13).

The residence was secured by approximately 10:10 a.m. (Tr. 124:10–13; *see* Gov't Ex. 3). After securing the residence, SA Olson began interviewing Defendant Akale in a vehicle outside. Sgt. Peterson and Agent Henning began interviewing Defendant Werb in his bedroom. After the initial entry at 10:00 a.m., the search lasted until approximately 1:15 p.m. (Tr. 89:19–90:3, 124:4–9). No one else was in the residence besides Defendants Akale and Werb, other than law enforcement. (Tr. 137:18–21).

### C. The Interview of Defendant Akale

After securing the residence, mainly Defendant Werb's bedroom, SA Olson went to speak with Defendant Akale. (Tr. 23:8–14). SA Olson found Defendant Akale at the entryway to the residence where law enforcement first encountered him. (Tr. 23:13–23, 46:4–47:2, 95:20–96:5). SA Olson explained to Defendant Akale that the search was related to an ongoing investigation by law enforcement, and that he would like to discuss the matter with Defendant Akale. (Tr. 23:13–24:6, 95:20–96:5). But due to the ongoing execution of the search warrant, SA Olson suggested that Defendant Akale speak with him outside in a van. (Tr. 23:13–24:6, 24:14–19, 96:6–23). SA Olson told Defendant Akale that he was not under arrest. (Tr. 23:13–24:6, 24:20–25, 26:17–23, 47:3–11, 48:22–49:4; *see* Tr: 52:23–53:16).

SA Olson and Defendant Akale walked outside. (Tr. 24:3–6, 47:24–49:4). No member of law enforcement touched Defendant Akale as they walked to the van and

Defendant Akale was not handcuffed. (Tr. 25:16–18, 47:24–49:4). The plain, unmarked van was parked at a nearby street corner. (Tr. 24:7–13). The van had been kept running with the heat on because it was cold outside. (Tr. 24:14–19, 26:10–13). Two officers were in the front driver's seat and passenger seat, the middle bench seat had been previously removed from the van, and Defendant Akale was seated on the left side of the back bench seat with SA Olson on the right. (Tr. 25:1–9, 49:5–23).There was a space in between Defendant Akale and SA Olson. (Tr. 56:23–57:3). Both sides of the van had sliding doors, which were unlocked. (Tr. 25:10–11, 26:2–9, 49:5–23).

The interview of Defendant Akale began at approximately 10:18 a.m. (Tr. 18:8–11, 25:12–15, 49:24–50:2, 104:4–8).  SA Olson started by asking Defendant Akale about his relationship with Zibo Li. (Tr. 26:24–27:3). SA Olson asked Defendant Akale about various matters related to the investigation, including Defendant Akale's knowledge of the cell phone scheme underlying the conspiracy, his purchase of cell phones from several co-conspirators, his sale of those cell phones to Zibo Li and others, his knowledge of recruiting homeless persons in order to use their names and identities to acquire phones, his understanding of what constituted a "bad ESN" phone,[5] his purchase of "bad ESN" phones, how he was paid for the phones he sold, and his knowledge of what Zibo Li did with the phones after acquiring them. (Tr. 26:24–27:19, 27:24–30:17, 75:10–23, 105:14–110:13).

---

[5] A "bad ESN phone" is a phone classified by the major cell phone carriers as lost, stolen, or blacklisted due to delinquent account payments. (Tr. 28:11–24, 132:14–17). A "bad ESN phone" cannot be operated on the mobile networks in the United States. (Tr. 28:11–24).

SA Olson started winding down the interview by asking Defendant Akale various biographical questions. (Tr. 30:18–20, 33:3–10). SA Olson then asked Defendant Akale if he would cooperate with law enforcement by helping find people that bought phones. (Tr. 30:21–24, 62:7–63:23; *see* Tr: 52:23–53:16). Initially, Defendant Akale said he would help, but backtracked saying that companies should have better fraud protection and law enforcement should do their job. (Tr. 30:24–31:11). Defendant Akale and law enforcement ended the interview cordially and exited the van. (Tr. 32:19–20, 33:11–12). SA Olson told Defendant Akale that he could go back inside the building, but would have to wait in the lobby area if the search was still ongoing. (Tr. 33:3–10, 63:24–64:25). The interview lasted about two and one half hours, ending at 12:45 p.m. (Tr. 27:20–23, 89:19–90:1, 104:4–8).

SA Olson testified that it is Secret Service policy not to record interviews, so this interview was not recorded. (Tr. 25:23–26:1, 50:3–51:25). SA Olson testified that he was also not equipped to record the interview. (Tr. 50:3–51:25). Defendant Akale was never read his *Miranda* rights because law enforcement believed he was not under arrest. (Tr. 26:17–23, 49:24–50: 11, 110:14–22). SA Olson testified that, in the course of the interview, he never raised his voice or used profanity. (Tr. 31:12–19). SA Olson testified that he never threatened Defendant Akale or made any promises. (Tr. 32:6–16, 74:11–75:1). SA Olson testified that he believes he has a "cordial, friendly" interview manner, but he did adopt a "stern" tone when describing the crime for which he was investigating Defendant Akale. (Tr. 31:12–17, 53:21–25, 55:20–60:20, 75:2–9). SA Olson found Defendant Akale to be calculating then cooperative, polite but evasive, but never excited

or emotional. (Tr. 31:20–32:5, 110:3–10). Defendant Akale never left the van during the interview, never asked to leave or take a break, and never asked for an attorney. (Tr. 32:17–33:2, 54:13–55:19, 74:11–75:1). SA Olson testified that he does not remember if he offered Defendant Akale a smoke break or anything to drink. (Tr: 53:17–54:12).

Defendant Akale was about 34 years old at the time of the interview. (Tr. 33:13–14). He told SA Olson that he works in real estate. (Tr. 33:15–20).  Defendant Akale has prior history with law enforcement, including convictions for misdemeanor theft and domestic violence. (Tr. 33:21–34:1).

### D.  The Interview of Defendant Werb

As noted above, Defendant Werb was in his bedroom at the time law enforcement entered the residence. Defendant Werb was sitting on the bed wearing a shirt and long pants by the time Sgt. Peterson relieved SA Olson. (Tr. 116:1–117:5, 160:10–12; Gov't Ex. 1–3). Defendant Werb's bedroom is approximately ten feet by ten feet. (Tr. 160:15–19, 175:4–12). From the point-of-view of lying in the bed, the queen-sized bed was pushed against the wall, windows were to the left, and the door was to the front right. (Tr. 160:20–163:6, 175:4–12). To the immediate right of the bed was a bedside table and a closet was to the left. (Tr. 163:12–24, 175:4–12; Gov't Ex. 1–3). On the bedside table was a phone, lamp, and laptop. (Tr. 163:22–164:1, 175:4–12, 182:16–183:4; Gov't Ex. 1–3). The door to Defendant Werb's bedroom was shut, but not locked, so as to prevent distraction from and interference with the ongoing search of the remainder of the residence. (Tr. 128:20–129:2, 130:4–7). The only individuals in the bedroom were

Defendant Werb, Sgt. Peterson, and Agent Henning.[6] (Tr. 129:3–8, 147:12–148:7). Sgt. Peterson was leaning on the wall two to three feet from the foot of the bed, with the door to her left as she faced the bed. (Tr. 129:17–130:3, 160:13–14). Agent Henning was to the right of Sgt. Peterson, closer to the window. (Tr. 129:17–130:3). Defendant remained seated on his bed. (Tr. 129:12–16; Gov't Ex. 1–3). The bedroom had faint daylight coming through the window. (Tr. 163:7–11).

Sgt. Peterson advised Defendant Werb that he was not in custody and did not have to speak with law enforcement. (Tr. 130:11–131:1, 169:11–20). Defendant Werb testified that he was not told he was free to leave, (Tr. 177:14–15), but the Court does not find his testimony credible. Defendant Werb stated that he believed law enforcement would be coming to speak with him, so had previously spoken with an attorney. (Tr. 131:2–17, 176:20–177:2, 181:13–182:12). Defendant Werb indicated that, due to his discussions with his attorney, he believed he had done nothing illegal, so he had no problem speaking with law enforcement. (Tr. 131:2–17, 181:13–182:12). Sgt. Peterson began by asking Defendant Werb some biographical questions. (Tr. 131:18–21). Sgt. Peterson then asked about the scheme underlying the conspiracy charges. Defendant Werb explained that he sold hundreds of phones to Zibo Li and his knowledge of the "bad ESN" phone market. (Tr. 131:22–132:21, 190:20–191:16).

During the interview, Defendant Werb stated that he was woken from his sleep and had to use the restroom. (Tr. 134:1–16, 167:1–13, 178:19–179:4). Defendant Werb

---

[6] Agent Henning had to leave the room at some time during the interview for about five minutes because his patrol vehicle had been struck by a passerby due to icy road conditions. (Tr. 147:16–148:7). Defendant Werb did not recall Agent Henning leaving, but does recall that there was discussion of a car crash at some point. (Tr. 186:13–21).

testified that he was told to wait while it was arranged. (Tr. 178:19–179:4). Agent Henning walked with Defendant Werb from the bedroom down the hall to the restroom in part because the search was still ongoing. (Tr. 134:1–16, 167:14–22, 179:5–15). Sgt. Peterson stayed in the bedroom. (Tr. 167:23–168:3). Agent Henning checked the interior of the bathroom before Defendant Werb entered, then stood outside the bathroom door while Defendant Werb was inside. (Tr. 167:23–168:12, 179:5–15).

During the interview, Defendant Werb's cell phone received several calls. (Tr. 164:2–9, 177:16–24, 205:3–206:1). Defendant Werb told law enforcement that it was probably his girlfriend, Ms. Nguyen, calling him. (Tr. 177:16–178:18, 205:3–206:1). Defendant Werb believed Ms. Nguyen was concerned that he was late for a yoga appointment they had scheduled. (Tr. 177:16–178:18, 205:3–206:1). Defendant Werb asked law enforcement if he could answer the phone to tell Ms. Nguyen that he would not make the yoga appointment. (Tr. 177:16–178:18). Sgt. Peterson told Defendant Werb not to answer his cell phone. (Tr. 134:17–135:18, 177:16–178:18). Sgt. Peterson testified that this was in order to prevent him from altering any potential evidence on the phone. (Tr. 134:17–135:18). Sgt. Peterson, however, did allow Defendant Werb to use his phone to corroborate information he provided to law enforcement. (Tr. 134:17–135:18). Sgt. Peterson testified that she and Agent Henning were in control of the situation because the room had yet to be thoroughly searched, necessitating the protection of the scene's integrity. (Tr. 164:10–165:11, 169:7–170:4).

Towards the end of the interview, Sgt. Peterson asked Defendant Werb if there was anything he would be concerned about law enforcement finding during their search.

(Tr. 135:19–136:5, 153:19–154:16). Defendant Werb noted there was cocaine in his bedside table and steroids in the refrigerator. (Tr. 135:19–136:5, 153:19–154:16, 193:22–194:11). Defendant Werb stated that he would not discuss any drug-related questions before speaking with his attorney. (Tr. 135:19–136:5, 154:13–155:8, 189:2–190:1). Sgt. Peterson terminated the interview shortly thereafter. (Tr. 136:6–10, 189:2–190:1). The interview lasted about one hour. (Tr. 132:22–23). Defendant Werb testified that the interview seemed like it lasted a couple hours. (Tr. 177:3–4). The interview of Defendant Werb was not recorded per U.S. Secret Service policy, under whose direction Sgt. Peterson and Agent Henning were acting. (Tr. 165:12–166:17).

All three individuals then exited Defendant Werb's bedroom. (Tr. 136:24–137:2). The living room had already been searched, so Sgt. Peterson told Defendant Werb he could sit in there while his bedroom was searched. (Tr. 136:24–137:5, 147:4–8, 170:5–18).While in the living room, Defendant Werb went to the kitchen and made himself an espresso. (Tr. 170:5–18).

Sgt. Peterson found Defendant Werb to be cordial, forthcoming, and conversational. (Tr. 133:4–14). Sgt. Peterson testified that she and Agent Henning did not use raised voices or profanity. (Tr. 132:24–133:3, 190:2–11). Sgt. Peterson testified that neither she nor Agent Henning made any promises, threats, threats regarding imprisonment, or told Defendant Werb that he would "catch a break" for making admissions. (Tr. 133:15–25, 188:6–189:1). Defendant Werb testified that, throughout the interview, he internally felt high anxiety levels, was nervous, was shaken up, and that he did not feel at liberty to end the interrogation and leave. (Tr. 180:23–181:4, 190:12–19).

Defendant Werb testified that law enforcement entered the room with their pistols drawn and at head level, but that he did not feel threatened once they put their weapons away and everything took a more relaxed demeanor. (Tr. 176:4–10, 187:21–5).

At the time of the interview, Defendant Werb was 33 years old. (Tr. 137:6–7). Defendant Werb was employed flipping houses. (Tr. 137:8–11). Defendant Werb has previous experience with law enforcement related to selling knockoff sunglasses in 2007. (Tr. 137:12–17). Defendant Werb was not *Mirandized* by Sgt. Peterson or anyone in her presence. (Tr. 130:8–13, 146:23–147:3, 177:5–13, 193:22–194:11). In a State of Minnesota criminal complaint charging Defendant Werb with a felony drug possession crime, however, the statement of probable cause states: "In a post-*Miranda* statement, the defendant admitted that there was a small amount of cocaine in his nightstand and that the cocaine, as well as the steroids in the kitchen, belonged to him." (Def.'s Ex. 2). Sgt. Peterson testified that the warrant's signing officer was not involved with the case underlying the instant criminal charges, and does not know what role he played, if any, in the search of Defendant Werb's residence. (Tr. 155:9–156:11).

### E.  The Arrival of Ms. Nguyen at Defendant Werb's Residence

While the search was ongoing, Defendant Werb's girlfriend, Quinh "Charli" Nguyen, arrived around 11:50 a.m. (Tr. 34:2–12, 137:22–24). Two law enforcement officers, Sgt. Anderson and BCA Agent Sherry Koch ("Agent Koch") interviewed her. (Tr. 34:13–35:1, 137:25–136:2). Ms. Nguyen testified that she was supposed to pick up Defendant Werb for a yoga appointment at noon on February 27, 2014. (Tr. 204:20–205:2). Ms. Nguyen texted or called Defendant Werb at around 10:00 a.m. (Tr. 205:3–

15). When she had not heard back, she texted or called at around 11:30 a.m. (Tr. 205:3–206:1). Ms. Nguyen continued to call Defendant Werb and drove to his home when he continued not to respond. (Tr. 205:3–206:3). Upon arriving, Ms. Nguyen saw many vehicles parked around the building, which she found odd. (Tr. 206:4–9). As she walked towards the back of the building, she saw an SUV parked in the middle of the parking lot. (Tr. 206:10–15).

Ms. Nguyen testified that at this point she believed something was happening, so she decided to leave. (Tr. 206:16–19). Ms. Nguyen testified that an officer stepped out of the SUV, asked her who she was and what she was doing there. (Tr. 206:20–207:8). Ms. Nguyen responded that she was looking for Defendant Werb. (Tr. 206:20–207:8). The officer told her to wait there and that the house was off limits. (Tr. 206:20–207:8). Ms. Nguyen was then interviewed by two officers, Sgt. Anderson and Agent Koch. (Tr. 231:8–15). The interview took place in Agent Koch's unmarked, tan SUV vehicle. (Tr. 231:16–20, 210:15–211:11). During the interview, Ms. Nguyen stated her only source of income during the time of the search warrant was money she received from Defendant Werb. (Tr. 221:7–222:5). Ms. Nguyen received packages of electronics delivered in her name to Defendant Werb's residence and permitted Defendant Werb to purchase electronics using her eBay account. (Tr. 222:6–23). Ms. Nguyen testified that she had seen Defendant Werb ship boxes of electronics. (Tr. 222:24–224:12). She also saw Defendant Werb bring boxes of electronics to Zibo Li to sell. (Tr. 222:24–224:12). The interview did not last more than one hour. (Tr. 232:5–8, 211:7–11).

Ms. Nguyen testified that law enforcement then asked if they could look at her home. (Tr. 212:14–213:2). Ms. Nguyen testified that she asked law enforcement if that was necessary, to which they responded that she either gives consent or they would detain her for several hours while they obtained a search warrant. (Tr. 212:14–213:2, 228:3–6). Ms. Nguyen testified that she told law enforcement to do what they needed to do. (Tr. 213:5–9). Ms. Nguyen signed a consent to search form at 1:00 p.m. (Tr. 224:23–227:16; Gov't Ex. 4). The form indicates that Ms. Nguyen consented to the search of her apartment and the seizure of "any property which [law enforcement] feel[s] is reasonably related to the investigation of financial crimes." (Gov't Ex. 4). Several members of law enforcement drove to Ms. Nguyen's apartment and searched it. (Tr. 213:11–214:17). Ms. Nguyen testified that she was brought back to Defendant Werb's residence. (Tr. 214:18–215:6). Ms. Nguyen testified that she then met with Defendant Werb and discussed his questioning. (Tr. 215:9–217:2). Defendant Werb stated that he was in bed; Defendant Akale opened the door; and law enforcement came in. (Tr. 215:9–217:2). After that, Defendant Werb panicked and was detained in his room the entire time; law enforcement would not let him leave. (Tr. 215:9–217:2).

Between arriving at the scene and being interviewed in the vehicle, Ms. Nguyen testified that a couple officers met her at the door and "ushered her inside" the home into the living room. (Tr. 207:9–208:7). Ms. Nguyen testified that she asked what was going on, but received no answer but was told to sit on the couch. (Tr. 207:9–208:7, 208:21–209:20). Ms. Nguyen testified that she was bombarded with questions about who she was and why she was there. (Tr. 208:8–14). Ms. Nguyen testified that she could not see

20

Defendant Werb from where she was seated. (Tr. 208:15–19). Ms. Nguyen testified that she asked if she needed to stay, but was told "No, you are not going anywhere right now." (Tr. 209:21–210:9). Ms. Nguyen testified that she was questioned for at least one hour, maybe a little more. (Tr. 210:10–14). Sgt. Anderson testified that Ms. Nguyen was not brought into Defendant Werb's residence at any point because the search was being executed at the time. (231:24–232:4, 232:9–22). The Court does not find Ms. Nguyen's testimony credible.

### F.  The Interview of Defendant Nickerson

On March 21, 2014, a search warrant was executed at Defendant Nickerson's residence in St. Paul, Minnesota. (Tr. 233:17–25, 240:6–9, 253:23–254:2). A briefing was held at St. Paul Police Department Headquarters at 10:00 a.m. (Tr. 234:3–11). A total of 12 members of law enforcement then traveled to Defendant Nickerson's residence and executed the search warrant at 10:40 a.m. (Tr. 234:3–20). Sgt. Anderson knocked and loudly announced that it was the police. (Tr. 234:12–20). Law enforcement waited for about a minute until Defendant Nickerson opened the door. (Tr. 234:12–20, 254:3–255:2). Six officers entered Defendant Nickerson's residence with their weapons at the "low ready." (Tr. 234:12–20, 240:14–17). In the residence were Defendant Nickerson, two adult males, and a three-year-old girl. (Tr. 234:12–235:13, 242:11–243:10, 257:16–18, 254:3–255:2). The adult male occupants were handcuffed while officers performed a protective sweep. (Tr. 234:12–235:13, 240:24–241:5). After the sweep was complete, the occupants were told they were free go, but informed that if they

stayed at the residence they would be supervised in a designated spot while the search was ongoing. (Tr. 234:12–235:13, 242:11–243:10).

Defendant Nickerson's testimony tells a different story regarding entry. Defendant Nickerson testified that a female officer pulled Defendant Nickerson out of the door by her arm. (Tr. 254:3–255:2). Defendant Nickerson testified that she then asked to get her granddaughter. (Tr. 254:3–255:2). Defendant Nickerson picked up her granddaughter, and then police entered her home. (Tr. 255:20–256:11, 259:14–17). Defendant Nickerson testified that she then asked if she could grab her granddaughter's jacket but was told to wait. (Tr. 255:20–256:11). Defendant Nickerson testified that she was outside with her granddaughter for about five minutes before she was let back inside her residence. (Tr. 255:20–256:11). Defendant Nickerson testified that she was then brought upstairs to grab her identification. (Tr. 255:20–256:11). Law enforcement searched her room and brought Defendant Nickerson back downstairs. (Tr. 255:20–256:11).

The interview of Defendant Nickerson began at approximately 10:50 a.m. in Agent Koch's vehicle. (Tr. 234:3–11; Gov't Ex. 5–6). The vehicle was an unmarked, uncaged SUV. (Tr. 236:17–23). Sgt. Anderson testified that the interview took place in the vehicle so as to not be distracted by the ongoing search of the residence. (Tr. 235:14–236:7, 241:6–8). Sgt. Anderson testified that he did not control Defendant Nickerson's movement or touch her on the way to the vehicle. (Tr. 236:8–11, 259:18–24, 262:25–263:2, 256:12–20). Defendant Nickerson brought the juvenile girl with her to the vehicle. (Tr. 236:12–16, 259:18–260:9, 262:25–263:2). Agent Koch was seated in the front passenger seat; Defendant Nickerson was in the seat behind Agent Koch; Sgt. Anderson

was seated behind the driver's seat next to Defendant Nickerson; and the juvenile child

was in Defendant Nickerson's lap. (Tr. 236:24–237:5, 259:25–260:9; Gov't Ex. 6). None

of the vehicle's doors were locked at any time during the interview, and Defendant

Nickerson was seated next to an unlocked door. (Tr. 237:6–9). Defendant Nickerson

testified that she never felt free to leave. (Tr. 261:17–20).

Sgt. Anderson provided Defendant Nickerson a *Miranda* form. (Tr. 237:20–238:2,

243:11–23; Gov't Ex. 5–6). The form, which was read aloud by Sgt. Anderson, states:

"You have the rights to protection against self-incrimination listed below. Please read

along with the Officer, and initial each statement if you understand it." (Gov't Ex. 5–6).

Defendant Nickerson's initials are next to each of the following paragraphs, which were

read by Sgt. Anderson:

> (1) You have the right to remain silent and refuse at any time to answer any
> questions asked by a police officer
> (2) Anything you do or say can be used against you
> (3) You have the right to talk to a lawyer and to have the lawyer with you
> during any questioning
> (4) If you cannot afford a lawyer, one will be appointed for you, and you
> may remain silent until you have talked to the lawyer

(Gov't Ex. 5–6). Defendant Nickerson then read aloud the following portion of the form:

"The above rights have been read to me[.] I have initialed each paragraph to show that I

understand each of my rights[.] I have received a copy of this form[.]"(Gov't Ex. 5–6).

Defendant Nickerson's signature follows this statement. (Gov't Ex. 5).

Following this rights advisory, Sgt. Anderson told Defendant Nickerson that he

was working on an investigation into fraud and identity theft. (Gov't Ex. 6). Sgt.

Anderson asked Defendant Nickerson about her relationship with several individuals and

her work. (Gov't Ex. 6). Sgt. Anderson then asked Defendant Nickerson whether she misused personal identifying information. (Gov't Ex. 6). Sgt. Anderson told Defendant Nickerson that law enforcement already had the information ready to charge her federally, but that her cooperation would be helpful for her case. (Gov't Ex. 6). Defendant Nickerson explained how she passed personal identifying information to certain individuals in exchange for money. (Gov't Ex. 6). Defendant Nickerson explained how certain individuals made money by acquiring names to order cell phones, then selling those phones. (Gov't Ex. 6). Defendant Nickerson admitted that she knew the identities she provided were used to acquire the phones. (Gov't Ex. 6). During the interview, Defendant Nickerson stated she had no reason not to be honest and "I'm not trying to go away from my grandbaby." (Gov't Ex. 6). After Defendant Nickerson identified an individual in a photograph who was also causing trouble outside the vehicle, Agent Koch left the van to arrange for his arrest. (Gov't Ex. 6; Tr. 239:19–24). The juvenile girl left the vehicle at 11:43 a.m. because her mother arrived at the scene. (Tr. 239:15–18, 241:25–242:10; Gov't Ex. 6). Sgt. Anderson then summed up what they had covered in the interview. (Gov't Ex. 6). With that summary, Defendant Nickerson further explained her involvement with the underlying conspiracy. (Gov't Ex. 6). The interview concluded at 12:09 p.m. (Gov't Ex. 5–6). Defendant Nickerson was released pending further investigation. (Tr. 238:14–22; Gov't Ex. 6).

Sgt. Anderson found that Defendant Nickerson started the interview with feigned ignorance, followed by gradually-increasing cooperation. (Tr. 238:23–239:3). Defendant Nickerson became emotional during the interview when recounting family troubles where

she kicked her daughter out of the home. (Gov't Ex. 6). Sgt. Anderson believed the interview was cordial and relaxed and that he developed a good rapport with Defendant Nickerson. (Tr. 239:4–5, 241:16–24). Sgt. Anderson testified that he made no threats or threating physical movements during the interview, that he was relaxed, and his and Agent Koch's weapons were concealed. (Tr. 239:6–14, 263:3–19). At the time of the interview, Defendant Nickerson was 41 years old and had a high school education. (Gov't Ex. 5). She had recently been suspended from her employment at a legal services support company for the conduct underlying her criminal charges. (Gov't Ex. 6).

Defendant Nickerson's testimony contradicts the audio recording. Defendant Nickerson testified she had not been given her *Miranda* rights. (Tr. 258:10–14, 260:15–21). Defendant Nickerson testified that Sgt. Anderson told her if she continued to deny things, she would go to jail and her granddaughter would be put in child protection. (Tr. 258:1–9, 260:10–14). Defendant Nickerson testified that after Sgt. Anderson made these threats, she answered in the affirmative to everything he asked her because she was scared her granddaughter would be taken away. (Tr. 258:15–259:8). Defendant Nickerson testified that she believes she was in the vehicle for maybe 30 to 45 minutes before the audio recording began and Sgt. Anderson re-asked every question again in order to create a clear recording. (Tr. 262:4–24). Defendant Nickerson testified that between law enforcement knocking on her door and being read her *Miranda* rights, more than an hour elapsed. (Tr. 262:4–24). Based on the foregoing and the Court's observations of Defendant Nickerson during her testimony, the Court finds that Defendant Nickerson is not credible.

## II.   CONCLUSIONS OF LAW

### A.  Standards for Custodial Interrogation

Defendants Akale and Werb argue that they were in custody at the time of their interview with law enforcement. Because of this custody, they argue, law enforcement was required to provide them *Miranda* warnings. By not providing *Miranda* warnings, Defendants Akale and Werb assert that the statements they each made to law enforcement must be suppressed.

Under the Fifth Amendment, *Miranda* warnings are "required when interrogation is 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). To determine whether a defendant was "in custody" for *Miranda* purposes, courts first "consider the 'totality of the circumstances' confronting the defendant at the time of the interview, and then . . . determine 'whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest.'" *United States v. Muhlenbruch*, 634 F.3d 987, 995–96 (8th Cir. 2011) (quoting *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007); *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The court focuses on "objective circumstances, not on subjective views of the participants." *Muhlenbruch*, 634 F.3d at 996 (quoting *Flores-Sandoval*, 474 F.3d at 1146).

Courts have used the following non-exhaustive factors to inform the custody inquiry:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The first three factors are "mitigating factors" that "tend to mitigate the existence of custody at the time of the questioning," while the last three factors are "coercive factors" that "tend to aggravate the existence of custody." *Id.* "A finding of custody does not require the factual circumstances of a case to present all indicia; and a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor." *United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002).

"There is no requirement . . . that the *Griffin* analysis be followed ritualistically in every *Miranda* case." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004). But "[w]hen the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Id.* "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Id.* at 828.

### 1.  Defendant Akale was Not in Custody

In looking at the totality of the circumstances as guided by the *Griffin* factors, the Court concludes Defendant Akale was not in custody. The first *Griffin* factor, which is a mitigating factor, is present. When SA Olson began the interview, he informed Defendant Akale that he was not under arrest and that he did not have to speak with law enforcement. The Eighth Circuit has "long regarded these admonitions as weighty in the custody analysis" and has "never held that a person was in custody after receiving them." *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011); *Czichray*, 378 F.3d at 826 ("That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review), holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.") (internal citation omitted). After being told these admonitions, Defendant Akale walked with SA Olson to an unmarked police van parked nearby. Defendant Akale was not physically handled in any way, but entered the van under his own power.

The second *Griffin* factor is present. Defendant Akale was seated in a van, where movement is somewhat limited by nature of being in a vehicle, but he was in near proximity to two unlocked doors and was not handcuffed. Defendant Akale made no attempt to exit the vehicle. There is nothing to indicate he did not possess unrestrained freedom of movement during his questioning.

The third *Griffin* factor is present. While it is undisputed that law enforcement initiated contact with Defendant Akale, Defendant Akale voluntarily acquiesced to the questioning. *See Czichray*, 378 F.3d at 829 ("Against a backdrop of repeated advice that he was free to terminate the interview, [defendant's] decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest. This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators."). After being told he was not under arrest and did not have to speak with law enforcement, Defendant Akale walked unrestrained from the entryway of his residence to the van parked nearby.

The fourth *Griffin* factor, the first of the coercive factors, is absent. The Court sees no strong arm tactics or deceptive stratagems in the actions of law enforcement relating to the interview of Defendant Akale. Law enforcement entered the residence and swept it for officer safety. The residence was secured quickly, and interviews of the occupants began immediately afterward. While law enforcement made a show of force in sending over a dozen officers into the home, only three of those officers were present during the interview of Defendant Akale. SA Olson never made any threats or promises, conducted the interview in a cordial manner, and never raised his voice or used profanity. While SA Olson adopted a stern tone when confronting Defendant Akale with evidence from the criminal investigation, this is not coercive police conduct. *See United States v. Wallraff*, 705 F.2d 980, 991 (8th Cir. 1983) ("[T]he fact that the investigation has proceeded to a point in time at which it may be said to have focused on the defendant is insufficient to

render an interrogation custodial, and 'does not weigh heavily in that analysis.'")
(quoting *United States v. Jimenez*, 602 F.2d 139, 145 (7th Cir. 1979)).

The fifth *Griffin* factor is not present. Seventeen members of law enforcement
were either in the residence conducting a search warrant or performing some other related
role. "Any warrant search is inherently police dominated; there is nothing untoward about
that circumstance." *Perrin*, 659 F.3d at 721. SA Olson testified that the interview took
place in the vehicle because the residence was being searched and it was cold outside.
While Defendant Akale was in a police vehicle with three members of law enforcement,
such a situation is not police dominated. *See United States v. Hephner*, 103 Fed. App'x
41, 48–49 (8th Cir. 2004) (finding atmosphere not police dominated where defendant was
being transported fifteen miles inside a police squad car).

The sixth *Griffin* factor is not present. Defendant Akale was told at the start of the
interview that he was not under arrest. Defendant Akale was not arrested at the
conclusion of the interview and returned to his residence afterward.

In looking at the totality of the circumstances, and using the *Griffin* factors as
guidance, the Court finds that a reasonable person in Defendant Akale's position would
not consider his freedom of movement restricted to the degree associated with formal
arrest. Defendant Akale was not in custody at the time of his interview. Therefore, law
enforcement was not required to provide Defendant Akale with a *Miranda* warning. The
Court recommends Defendant Akale's motion to suppress be denied.

## 2.  Defendant Werb was Not in Custody

In looking at the totality of the circumstances as guided by the *Griffin* factors, the Court concludes Defendant Werb was not in custody. The first *Griffin* factor, which is a mitigating factor, is present. When Sgt. Peterson and Agent Henning began their interview, Sgt. Peterson informed Defendant Werb that he was not in custody and that he did not have to speak with law enforcement. The Eighth Circuit has "long regarded these admonitions as weighty in the custody analysis" and has "never held that a person was in custody after receiving them." *Perrin*, 659 F.3d at 721; *Czichray*, 378 F.3d at 826 ("That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review), holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.") (internal citation omitted). After being told these admonitions, Defendant Werb informed the two officers that he had already spoken with an attorney in anticipation of their arrival. Defendant Werb, in having conversed with an attorney, felt comfortable speaking to law enforcement because he believed he had not committed an illegal act.

The second *Griffin* factor is more difficult. During the interview, Defendant Werb did not have complete, unrestrained freedom of movement during questioning. This is not a result of the questioning itself, however, but a by-product of the ongoing search warrant. Defendant Werb's bedroom door was closed to prevent distractions from and

interference with the execution of the search warrant. "Any warrant search is inherently police dominated; there is nothing untoward about that circumstance." *Perrin*, 659 F.3d at 721; *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014). Defendant Werb was permitted to use the restroom when he asked, but given the ongoing search warrant, he was escorted to the restroom by Agent Henning. However, Defendant Werb was allowed to enter unattended and unsupervised, showing some freedom of movement that would trend away from custody. Defendant Werb was never handcuffed or physically handled by law enforcement at any point. Once Defendant Werb's interview was complete, he was permitted to mill about his residence in the areas that had already been searched, including making himself an espresso. The execution of the search warrant, more than the interview itself, controlled Defendant Werb's movement. The Court finds that while the second *Griffin* factor is partially present, the totality of the circumstances provides little to no support that such partial existence of the second factor indicates Defendant Werb was in custody or under arrest.

The third *Griffin* factor is partially present. While it is undisputed that law enforcement, not Defendant Werb, initiated contact in this instance, Defendant Werb voluntarily acquiesced to questioning. *See Czichray*, 378 F.3d at 829 ("Against a backdrop of repeated advice that he was free to terminate the interview, [defendant's] decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest. This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators."). Defendant Werb

demonstrated knowledge of his legal rights, including the right to speak to an attorney and how that interplayed with interactions with law enforcement. Defendant Werb, in explaining that he had already spoken with an attorney but decided that he was amenable to answering law enforcement's questions, demonstrated a degree of voluntariness in responding to questions. Furthermore, once the subject matter strayed into drugs within the home, Defendant Werb expressed his discomfort in continuing to answer anything in that line in questioning, further demonstrating his understanding that submission to law enforcement's questioning was voluntary. Law enforcement ended the interview shortly thereafter.

The fourth *Griffin* factor, the first of the coercive factors, is absent. The Court sees no strong arm tactics or deceptive stratagems in the actions of law enforcement relating to the interview of Defendant Werb. Law enforcement entered the residence and swept it for officer safety. The residence was secured quickly, and interviews of the occupants began immediately afterward. While law enforcement made a show of force in sending over a dozen officers into the home, only two officers were present during the interview of Defendant Werb. Defendant Werb was allowed to dress himself after law enforcement ensured his room was safe and before the interview began. Defendant Werb was permitted a restroom break sometime during his hour-long interview. Defendant Werb remained sitting on his bed, and Sgt. Peterson and Agent Henning stood some distance away from him. Sgt. Peterson and Agent Henning conducted the interview in a relaxed, cordial manner. Sgt. Peterson and Agent Henning did not make any threats or promises to Defendant Werb. Nor did they use profanity or shout. While Defendant Werb was

prevented from answering incoming phone calls and text messages, his cell phone was subject to the search warrant. "That a suspect is discouraged from using a telephone in his home during an interview often is not probative of whether he is free to terminate the interview altogether." *Czichray*, 378 F.3d at 828. In fact, "[a]ssuming a reasonable person in [Defendant Werb's] position would feel that he was not free to use the telephone during the questioning, he still retained two viable options: conduct an uninterrupted interview with the agents or terminate the interview." *Id.* The act of law enforcement in "placing certain ground rules on an interview does not preclude a reasonable person from foregoing the interview altogether." *Id.* Sgt. Peterson and Agent Henning had adequate reasoning for preventing such use, and their refusal Defendant Werb's request does not amount to a strong arm tactic.

The fifth *Griffin* factor is partially present because the atmosphere of the questioning was police dominated. As Sgt. Peterson testified, she and Agent Henning were in control of the situation. Seventeen members of law enforcement were either in the residence conducting a search warrant or performing some other related role, such as interviewing Defendant Akale or ensuring the scene was secure from interference by outside persons, such as Ms. Nguyen. "Any warrant search is inherently police dominated; there is nothing untoward about that circumstance." *Perrin*, 659 F.3d at 721. Police dominance is further diminished because Defendant Werb was in his own bedroom. As the Eighth Circuit has noted, "[a] reasonable person would have taken some comfort, however, in being in his own bedroom instead of an interrogation room at the police station." *Perrin*, 659 F.3d at 721; *Czichray*, 378 F.3d at 826 ("When a person is

questioned 'on his own turf,' we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'") (quoting *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984) and *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985)).

The sixth *Griffin* factor is not present. Defendant Werb was told at the start of the interview that he was not under arrest. Defendant Werb was not arrested at the conclusion of the interview.   In fact, Defendant Werb was permitted to mill about the already-searched areas of his residence after his interview was terminated.

In looking at the totality of the circumstances, and using the *Griffin* factors as guidance, the Court concludes that Defendant Werb was not in custody at the time of his interview. While Defendant Werb testified that he felt he was not free to conclude the interview and leave, the Court must look at the objective circumstances and not the subjective view of the participants. Defendant Werb's own conduct shows that he felt free enough to refuse to answer any questions about drugs within the home and that he felt comfortable asking for a bathroom break. Thus, the Court finds that a reasonable person in Defendant Werb's position would not consider his freedom of movement restricted to the degree associated with formal arrest. *See United States v. Sutera*, 933 F.2d 641 (8th Cir. 1991) (no custody where law enforcement executed a search warrant, told defendant he was not under arrest and did not have to answer questions, and then interviewed defendant for one hour in his bedroom while the search was ongoing). Therefore, law enforcement was not required to provide Defendant Werb with a *Miranda* warning.

Defendant Werb relies heavily upon the facts of the *Griffin* case itself to support his argument that he was in custody. *Griffin* is distinguishable from this case. Griffin, unlike Defendant Werb, was not informed that he was not under arrest or that he did not have to answer questions. *Griffin*, 922 F.2d at 1346. Further, Griffin was escorted by law enforcement to retrieve cigarettes from other rooms in the house and was told to remain in their view at all times. *Id.* Defendant Werb, while escorted to the bathroom, was not within the view of law enforcement while he was inside using it. Unlike Griffin, Defendant Werb felt comfortable enough to make himself an espresso while law enforcement was searching his bedroom. Moreover, Griffin's home was not subject to an ongoing search warrant that required the preservation of evidence as did Defendant Werb's residence. *Id.* (after arriving at Griffin's home, two agents were invited into the living room by Griffin's stepfather, where they waited until Griffin arrived home). Finally, Griffin was arrested at the end of the interview. *Id.* Defendant Werb was not. Given these many differences, Defendant Werb's reliance upon the facts of *Griffin* is misplaced and does not detract from this Court's conclusion. The Court recommends Defendant Werb's motion to suppress be denied.

## B.  Defendant Nickerson's Statements Were Voluntary

Defendant Nickerson argues that she was psychologically coerced, rendering her statements involuntary. She also argues that this coercion rendered her *Miranda* waiver involuntary. Given this, Defendant Nickerson seeks to suppress her statements made to law enforcement.

Absent evidence that a defendant's "will was overborne and his capacity for self-determination critically impaired because of coercive police conduct, his waiver of his Fifth Amendment privilege was voluntary under . . . *Miranda*." *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (citations and quotations omitted); *Jenner v. Smith*, 982 F.2d 329, 333 (8th Cir. 1993) (an inculpatory statement is inadmissible if the defendant proves that her "will was overborne and [her] capacity for self-determination critically impaired" by coercive police activity). "But it is a rare case when a defendant 'can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda*.'" *Williams v. Norris*, 576 F.3d 850, 868 (8th Cir. 2009) (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)).

Due process requires that confessions be voluntary. *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961); *Brown v. Mississippi*, 297 U.S. 278, 285–86 (1936). The test is "an inquiry that examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession. The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *accord Mincey v. Arizona*, 437 U.S. 385, 401 (1978). A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth*, 412 U.S. at 225. On the other hand, a "statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically

impair his capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (en banc). The government "must prove at least by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Involuntary statements are inadmissible at trial for any purpose. *Michigan v. Harvey*, 494 U.S. 344, 351 (1990).

When faced with cases where only one factor was present, the Supreme Court and Eighth Circuit have consistently held that a defendant's statements were voluntary. *E.g.*, *Colorado v. Connelly*, 479 U.S. 157 (1986) (found the defendant's confession to be voluntary despite his severe mental illness because there was no evidence of police coercion or overreaching); *United States v. Makes Room for Them*, 49 F.3d 410 (8th Cir. 1995) (found the defendant's confession to be voluntary where the defendant had a diminished capacity to resist pressure but there was no police coercion); *LeBrun*, 363 F.3d 715 (found the defendant's confession to be voluntary where, although there was ample evidence of police overreaching, defendant did not have a particularly susceptible nature or sensibility); *United States v. Astello*, 241 F.3d 965 (8th Cir. 2001) (same). Therefore, in order to show that a statement was involuntary, Defendant must show that there was law enforcement coercion or overreaching to the extent that his will was overborne, and that he had signs of susceptibility to having his will overborne. *United States v. Klynsma*, 2009 WL 3147790, at *31 (D. S.D. 2009).

When considering the totality of the circumstances, courts have considered various factors. The inquiry into the characteristics of the accused "depend[s] on the actual mindset of a particular suspect," that is, "whether 'the defendant's will was overborne,' a

question that logically can depend on 'the characteristics of the accused.'" *Yarborough v. Alvarado*, 541 U.S. 652, 667–8 (2004) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) and *Schneckloth*, 412 U.S.at 226). In reviewing the characteristics of the accused, courts have considered the suspect's age, education, intelligence, size, prior experience with law enforcement, and mental and physical condition. *Yarborough v. Alvarado*, 541 U.S. at 668; *Arizona v. Fulminante*, 499 U.S. 279, 286 n.2 (1991). In looking at the details of the questioning, courts have considered: its length, *Spano v. New York*, 360 U.S. 315 (1959); its continuous nature, *Leyra v. Denno*, 347 U.S. 556, 561 (1954); its location, *Reck v. Pate*, 367 U.S. 433, 441 (1961); law enforcement's use of fear to "break" a suspect, *Malinski v. New York*, 324 U.S. 401 (1945); and promises made by law enforcement, *LeBrun*, 363 U.S. at 725.

In looking at Defendant Nickerson's characteristics, the Court is hard-pressed to find that she had any signs of susceptibility to having her will overborne. Defendant Nickerson was 41 years old at the time of the interview, had a high school education, and was employed full-time until shortly beforehand. Defendant Nickerson was read her *Miranda* rights and initialed next to each paragraph, signaling that she understood them. Defendant Nickerson then read aloud the following: "The above rights have been read to me. I have initialed each paragraph to show that I understand each of my rights. I have received a copy of this form."(Gov't Ex. 5–6).

Defendant Nickerson argues that law enforcement threatened her by telling her if she did not cooperate, her granddaughter would be removed from her care and placed in child protection. The Court does not find Defendant Nickerson credible. Moreover, the

only references to Defendant Nickerson's granddaughter during the entirety of her interview with Sgt. Anderson are made by Defendant Nickerson herself. On multiple occasions, Defendant Nickerson stated she had no reason to lie because she did not want her grandchildren taken away due to her incarceration. Thus, the psychological coercion that Defendant Nickerson insists was present during the interrogation was self-manufactured. The only time Defendant Nickerson became emotional was when she was describing a family incident unrelated to the underlying charges in which she evicted her adult daughter from the home.

In looking at the details of the questioning, the Court also finds no coercion. Defendant Nickerson insists that she was questioned for some period of time before she was advised of her *Miranda* rights and the audio recording was started. Defendant Nickerson's testimony is not credible. The timeline urged by Defendant Nickerson is impossible given the credible testimony of Sgt. Anderson, the *Miranda* waiver form, and the audio recording. Defendant Nickerson's interaction with law enforcement, from entry into her home to termination of the interview, lasted approximate 90 minutes. *See Stein v. New York*, 346 U.S. 156, 185–86 (1953) (no coercion in twelve hours of intermittent questioning over a thirty-two hour period); *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988) (no coercion in seven and one-half consecutive hours of questioning). Defendant Nickerson was not handcuffed; she walked to the vehicle herself; and she was permitted to hold her granddaughter throughout the interview until her mother retrieved her. Sgt. Anderson and Agent Koch did not raise their voices or use profanity; they made no verbal or physical threats; and their weapons were concealed. While Sgt. Anderson did

ask for Defendant Nickerson's cooperation, indicating that law enforcement already had sufficient information to charge her federally but that her assistance would be beneficial, this was in a backdrop where Defendant Nickerson was read and understood her *Miranda* rights, including the voluntariness of the interview. The Court finds no police coercion.

Under the totality of the circumstances, the Court finds that Defendant Nickerson's will was not overborne. Defendant Nickerson's *Miranda* waiver was valid and her statement to law enforcement was voluntary. Therefore, the Court recommends that Defendant Nickeron's motion to suppress be denied.

### C. Defendant Werb's Motion for Severance

Defendant Werb seeks to sever his case for trial from that of his co-defendants. (ECF No. 129). "When a defendant moves for a severance, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8. If joinder is proper, the court still has discretion to order a severance under Federal Rule of Criminal Procedure 14." *United States v. Darden*, 70 F.3d 1507, 1526 (8th Cir. 1995). These rules "are liberally construed in favor of joinder." *United States v. Rimell*, 21 F.3d 281, 288 (8th Cir. 1994); *Darden*, 70 F.3d at 1526. The propriety of joinder "must appear on the face of the indictment." *United States v. Bledsoe*, 674  F.2d 647, 655 (8th Cir. 1982) (citations omitted).

Rule 8 of the Federal Rule of Criminal Procedure allows for the joinder of offenses and defendants in criminal cases. Under Rule 8(a), offenses may be joined if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P.

8(a). Under Rule 8(b), defendants may be joined if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The defendants "may be charged in one or more counts together or separately" and "need not be charged in each count." Fed. R. Crim. P. 8(b); *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996) ("Importantly, not every defendant joined must have participated in every offense charged.") (citation omitted).

In general, "persons charged in the same offense should be tried together, especially when proof against them is based upon the same evidence or acts." *United States v. Voss*, 787 F.2d 393, 401 (8th Cir. 1986); *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996) ("Where codefendants are charged with the same crimes, including conspiracy, and the crimes of the codefendants will be proved by the same evidence, joint trials are generally favored.") (citation omitted). "Trying codefendants together not only conserves scarce time and resources, but also 'gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome.'" *United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) (quoting *Darden*, 70 F.3d at 1528).

Here, Defendant Werb is charged in a three-year conspiracy in which he is alleged to have sold stolen and fraudulently-obtained unauthorized access devices to Defendant Li, who then sold the access devices to buyers in Hong Kong for substantial profits. Defendant Akale is alleged to have participated in the conspiracy as a middleman similar to Defendant Werb. Defendant Nickerson is alleged to have played a different role, where

she provided other co-conspirators with stolen means of identification which were used to fraudulently obtain access devices that were then sold to conspirators such as Defendants Werb and Akale. Because of her particular role in the conspiracy, Defendant Nickerson is also charged with aggravated identity theft. Defendant Li is the alleged head of the conspiracy and is thus charged with the crime of fraud and related activity in connection with access devices. Defendants Li and Nickerson's separately-charged crimes are each overt acts in furtherance of the conspiracy charged against all defendants. Evidentiary proof against the defendants will likely be the same because the Government will need to prove the links of the conspiracy from Defendant Nickerson, through Defendants Werb and Akale, to Defendant Li. Thus, joinder of offenses and defendants was proper under Rule 8 given the common scheme and acts alleged.[7]

Although Rule 8 permits joinder, "a trial court may order separate trials on different counts, or sever certain defendants' cases from others', to protect defendants' fair-trial rights." *Delpit*, 94 F.3d at 1143 (citing Fed. R. Crim. P. 14(a); *Darden*, 70 F.3d at 1527). Where multiple defendants have been charged in the same indictment, "there is a preference for a joint trial unless the benefits are outweighed by a clear likelihood of prejudice." *Hively*, 437 F.3d at 765 (citing *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *United States v. Cooper*, 2006 WL 2095217, at *2 (N.D. Iowa 2006) ("There is a

---

[7] While this Court only examined Defendant Werb's motion to sever in light of the remaining defendants for trial, its analysis is the same for those defendants who have already pleaded guilty. The nine co-defendants all played a role in the conspiracy. Defendants Derek Krez McCormack (3) acted as a middleman alongside Defendants Akale and Werb. Defendants Ifrah Isaak Nor (9) and Randolph Kendrick Williams (8) acted as buyers, who sold phones to the middlemen after acquiring them from individuals such as Defendant Nickerson and Defendant Reginald Demarius Washington (7). Defendant Elijah Wayne Jackson (5) facilitated the buyers' transactions. Thus, it is clear from the face of the indictment that joinder of the defendants and offenses was proper.

presumption against severing properly joined cases, and such presumption is a 'strong' one.") (citing *Delpit*, 94 F.3d at 1143). The party seeking severance has the burden of showing a clear likelihood of prejudice. *United States v. Frazier*, 280 F.3d 835, 844 (8th Cir. 2002). Moreover, "[s]everance is never warranted simply because the evidence against one defendant is more damaging than against another." *Hively*, 437 F.3d at 765. This remains true even if severance might increase the likelihood that a defendant will be acquitted. *Id.*; *United States v. Anthony*, 565 F.2d 533, 538 (8th Cir. 1977).

Defendant Werb asserts that failure to sever his trial from that of his co-defendants presents two prejudicial concerns. First, Defendant Werb argues there is a risk for a prejudicial trial in that the admission of any extra-judicial statements by his co-defendants would violate his Sixth Amendment right to confrontation should that co-defendant not testify, per *Bruton v. United States*, 391 U.S. 123 (1968). *Bruton* held that the admission of an incriminating statement by non-testifying co-defendant at a joint trial violates the defendant's rights under the Confrontation Clause. 391 U.S. at 137. "*Bruton*, however, does not preclude the admission of otherwise admissible statements by a co-conspirator under Rule 801(d)(2)(E)." *United States v. Singh*, 494 F.3d 653, 658 (8th Cir. 2007) (citing *United States v. Mickelson*, 378 F.3d 810, 819 (8th Cir. 2004)) ("However, when the statements are those of a co-conspirator and are admissible under Federal Rule of Evidence 801(d)(2)(E), the Sixth Amendment and *Bruton* are not implicated."). Therefore, "co-conspirators' statements made in furtherance of a conspiracy and admitted under Rule 801(d)(2)(E) are generally non-testimonial and, therefore, do not violate the Confrontation Clause as interpreted by the Supreme Court." *Singh*, 494 F.3d at 658

(citing *Crawford v. Washington*, 541 U.S. 36, 51–54 (2004)); *see United States v. Lee*, 374 F.3d 637, 644 (8th Cir. 2004) (applying *Crawford* in holding that casual statements to an acquaintance, statements to a co-conspirator, and business records are not testimonial). The Government acknowledges *Bruton* and its progeny, and intends to avoid *Bruton* issues by redacting any testimonial statements. (ECF No. 170, at 6 n.2, 13 n.4). Thus, Defendant Werb has not shown a clear likelihood of prejudice due to *Bruton* concerns.

Second, Defendant Werb argues that a jury cannot reasonably be expected to compartmentalize the evidence as it relates to separate defendants. Defendant Werb argues that, given the complexity of the case and voluminous evidence, there is a grave risk the jury will blur the lines between defendants and apply evidence incorrectly to other defendants. "Prejudice can be demonstrated by showing that the jury will be unable to compartmentalize the evidence as it relates to the separate defendants because of a 'prejudicial spillover effect.'" *Hively*, 437 F.3d at 765 (quoting *Mickelson*, 378 F.3d at 817). Where there is only some risk of prejudice by joinder, proper jury instructions can cure the risk of prejudice. *Zafiro*, 506 U.S. at 540; *Mickelson*, 378 F.3d at 818 ("The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions."); *see also United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003) ("In our consideration of the jury's ability to compartmentalize the evidence against the joint defendants, we consider 1) the complexity of the case; 2) if one or more of the defendants were acquitted; and 3) the adequacy of admonitions and instructions by the trial judge."). Here, Defendant Werb only argues that "[a] limiting instruction will not alleviate this

prejudice." Defendant Werb is an alleged middleman in the conspiracy. As noted above, evidentiary proof against the defendants will likely be the same because the Government will need to prove the links of the conspiracy from Defendant Nickerson, through Defendants Werb and Akale, to Defendant Li. This Court finds that adequate jury instructions and admonitions by the trial judge would be sufficient in this case to assist the jury's ability to compartmentalize the evidence and prevent prejudice.

The Court finds that joinder of defendants and offenses is proper. The benefits of a joint trial are compelling. All defendants are charged in a single conspiracy, in which lower members acquired cell phones through stolen identities. Those phones were then gathered by middlemen who in turn sold them to the head of the conspiracy, who ultimately sold those phones overseas for substantial profits. The overlapping evidence will give the jury the best perspective, increasing the likelihood of a correct outcome. A joint trial will also conserve scarce judicial time and resources. Defendant Werb has not demonstrated a clear likelihood of prejudice. Therefore, this Court recommends that Defendant Werb's motion to sever be denied.

## III.   RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant Akale's Motion to Suppress Statement, (ECF No. 173), be **DENIED**.

2.  Defendant Werb's Motion to Suppress Statements, (ECF No. 123), be **DENIED**.

3. Defendant Nickerson's Motion to Suppress Statements Obtained in Violation of Defendant's Constitutional Rights, (ECF No. 146), be **DENIED**.

4. Defendant Werb's Motion for Severance, (ECF No. 129), be **DENIED**.


Date:  December 21, 2015

_s/ Tony N. Leung_
Tony N. Leung
United States Magistrate Judge
District of Minnesota

_United States v. Li et al._
File No. 15-cr-153 (DSD/TNL)


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.